Hillsborough,
No. 5514.

### STATE *v*. EDWARD H. COOLIDGE, JR.

Argued December 20, 1968.
Supplemental argument June 3, 1969.
Decided June 30, 1969.

404

*Alexander J. Kalinski,* special counsel (by brief and orally), for the State.

*Matthias J. Reynolds, John A. Graf, Robert L. Chiesa,* and *Stephen J. Spielman* (by brief and orally), for the defendant.

DUNCAN, J. In January 1964, Pamela Mason resided with her parents and younger brother at 51 Donald Street in Manchester. She was a student at West High School, and upon occasion hired out after school hours as a baby sitter. On the afternoon of January 13, 1964 her mother received a telephone call from a man who sought a baby sitter for that evening. Mrs. Mason suggested that he call again after school hours. Pamela arrived home from school at about 4:15 P.M. and at 4:30 P.M. Mrs. Mason left for work at the Holiday Inn. A severe snow storm was then in progress. Before leaving, Mrs. Mason told Pamela of the expected phone call, and cautioned her against leaving the house to baby sit unless a woman should call for her. Shortly thereafter Pamela received a telephone call which her brother answered, but did not overhear. The caller was a man. Pamela then prepared supper for herself and her brother. She left the house at some time between 5:45 and 6:00 P.M. while her brother was assisting the landlord in installing an electrical fuse in the basement. No one saw Pamela leave the driveway. Because of the storm her mother did not return until about 3:00 A.M. on January 14, 1964. Pamela's family and the authorities had no further information concerning her whereabouts until January 21, 1964, when a passing truck driver discovered her lifeless body lying west of the southbound side of interstate highway 93, in Manchester, about six-tenths of a mile north of the Manchester-Londonderry line.

The storm of January 13 continued until midnight. It was a major storm with blizzard conditions and a fall of eleven inches, temperatures between seven and fifteen degrees, and heavy drifting. Temperatures remained below freezing through January 16, 1964 and on the night of January 20, 1964, a rain storm commenced.

An autopsy performed on the evening of January 21, 1964

showed that death resulted from several gunshot and knife wounds, including severance of the jugular vein. There was expert testimony that death had occurred on January 13, 1964 some two to four hours after the victim's last meal.

The evidence connecting the defendant with the crime was wholly circumstantial. He was employed by Cote Brothers Bakery as a route man. Evidence that he was absent from his home at 312 Seames Drive in Manchester between 5:30 P.M. and 11:15 P.M. on January 13, 1964 was not disputed. The defendant took the stand in his own behalf and denied all knowledge of the crimes charged. He admitted that he had attempted following January 13 to establish an alibi for his whereabouts that night, but asserted that in fact he had driven his Pontiac to Haverhill, Massachusetts to look for a gift for his wife for their wedding anniversary on January 15, 1964.

Various issues arising out of pretrial proceedings in these cases were considered by this court in *State* v. *Coolidge,* 106 N. H. 186, and *State* v. *Superior Court,* 106 N. H. 229. In support of the exceptions transferred following the trial the defendant relies both upon the broad proposition that there was insufficient evidence to warrant his conviction, and upon numerous alleged violations of his .rights under the State Constitution and the Fourth, Fifth, and Sixth Amendments to the Constitution of the United States, alleged errors relating to the admissibility and exclusion of evidence, and in the denial of various motions made during and after the trial.

The defendant's exception to denial of his motion for directed verdicts of acquittal upon the ground that the evidence did not warrant a finding of guilty beyond a reasonable doubt cuts across other exceptions, and its consideration requires a survey of the evidence. That there was evidence to warrant a finding that the victim was murdered is not a debatable question. It could also reasonably be inferred that kidnaping accompanied the offense.

As previously stated, evidence which pointed to the defendant as the perpetrator of the crime was circumstantial. The State produced evidence that the fatal bullets were fired from the defendant's gun. It was established that he owned more than one knife which could have inflicted the knife wounds, and that one of his knives was lost on the day that the victim disappeared, and found on the following morning near a laundromat which

the defendant testified he had visited before going home the night of the 13th. The defendant conceded that on the night of January 13, 1964 he had been stationed in his Pontiac at the northbound side of Route 93 nearly across from where the victim's body was later found. There was other evidence that his Pontiac was then seen at 9:30 or 9:45 P.M., headed north, approximately across from where the body was found west of the southbound lanes.

There was evidence that comparison of a variety of particles of material found upon the defendant's clothing and in his Pontiac with particles found upon the victim's clothing showed similarities in such a number of instances as to indicate by the law of probabilities that there had been contact between the victim, and the accused or his vehicle. There was evidence that the telephone call which Mrs. Mason received on the afternoon of January 13, 1964 was that of a man whose voice Mrs. Mason later identified as "very similar" to that of the defendant, and that Pamela disappeared shortly after she received another call from a man.

There was evidence that on the day after the disappearance and as late as January 24, the defendant engaged in elaborate attempts to establish an alibi for the night of January 13; and that on January 21, when thawing conditions prevailed and the body was found, but before its actual discovery, he had said that "now" he "really needed an alibi." His explanations of his activities on January 13 and of his presence, stopped on the highway that night, could be found incredible. His acknowledged activities in the week which followed January 13 warranted an inference of guilt. State v. Thorp, 86 N. H. 501, 507.

There was evidence that the victim died within two to four hours of her last meal, and expert testimony to warrant a finding that death occurred on January 13. In the absence of evidence suggesting that death occurred outside of Hillsborough county, the discovery of the body within the Manchester limits warranted a finding that the crimes were committed there.

The proof, however, was not wholly free from weaknesses. No one witnessed Pamela's departure from her home, or could say under what circumstances it actually occurred. The time lapse between her departure at 5:45 or 6:00 P.M. and the discovery of the defendant in his automobile near the scene where the frozen body was later found was approximately three and

one-half hours. The evidence showed that when found the body was without undergarments, the blouse had been removed, but was frozen to the victim's back. A jacket, ski pants, socks, and boots were in normal position, but the pants were torn or cut at the crotch, and the zipper was jammed. The victim's books, pocketbook, and scarf were scattered over the area. The body was exsanguinated, but there was no evidence of blood discovered in the defendant's car or upon his clothing and there was little blood on the victim's clothing. There was expert testimony that no anatomical evidence demonstrated that she was killed at the place where she was found.

The limitations of time served to cast doubt upon the likelihood that the State was correct in its theory that the crimes had been committed in a space of three and one-half hours of extremely stormy weather. Further doubts were cast by evidence that the defendant was seen at a Manchester club at about 5:30 P.M. and that between 6:30 and 7:00 P.M. he saw an acquaintance at the Sears-Roebuck store on Elm Street, who was in fact there at that hour.

In the field of ballistics, the credibility of the State's evidence was strained by events which transpired at the trial. Certain of its experts testified that the murder weapon received in evidence had also fired the bullets which had killed Sandra Valade, another minor, in February, 1960. Evidence later produced by the defendant established that he had not acquired the weapon until December 1961 when it was sent to him by mail direct from the manufacturer. Additionally, two experts who had examined both the Valade and Mason bullets testified that the Valade bullets had not been fired from the defendant's Mossberg rifle. One of them called by the defendant testified that the Mason bullets were not so fired. The other declined to give an opinion as to whether the Mason bullets were or were not so fired, for lack of sufficient opportunity to reach a final conclusion.

The evidence concerning matching particles was arguably inconclusive on the issue of probability. Twenty-seven particles from sources connected with the victim were said to match twenty-seven particles from sources related to the defendant; but evidence that each set of matching particles was independently different from other matching sets so that no duplication existed, was less positive. Tested by neutron activation analysis, only

four of fourteen particles from both sources were claimed to have a common origin.

Considering the evidence as a whole, and the inferences which could reasonably be drawn, both favorable and unfavorable to the defendant, and granting that a finding of guilt was not compelled, yet we cannot say that the jury which heard and saw the witnesses could not reasonably have been convinced, beyond a reasonable doubt, that the defendant committed the crimes with which he was charged. Even if doubt existed that the murder was committed on January 13, 1964, the conclusion that it was committed at some time thereafter was not foreclosed. The defendant had failed to check in for work on January 14, 1964, there was evidence that he was in Haverhill on that day, and his regular daily work route took him past the spot where the body was found.

We hold that denial of the defendant's motion for acquittal was not error. It follows that the evidence, if properly received, and believed, warranted the verdicts of guilty. They must stand unless errors at the trial or some violation of the defendant's rights require that they be set aside. We therefore turn to consideration of other exceptions argued by the defendant.

Certain constitutional issues presented pertain to the defendant's right to be free from unreasonable searches and seizures, his right to counsel, and his privilege against self-incrimination.

In particular it is argued that events which transpired on February 2, 1964, constituted an invasion of the defendant's rights and privileges. The nature of these events was detailed at length in *State* v. *Coolidge*, 106 N. H. 186, *supra*, and need not be repeated here. They are now pertinent primarily because of the evidence that the Mossberg rifle received in evidence at the trial as the murder weapon was procured from the defendant's wife by police officers on that occasion, and because the defendant was questioned by police on that day, without provision of counsel.

The contention that the rifle and articles of clothing were procured by unreasonable search and seizure was considered on the prior transfer, and the issue was decided adversely to the defendant. The defendant's contentions were renewed at the trial. We find no reason to depart from the conclusions previously reached in *State* v. *Coolidge, supra,* which are now

further supported by authorities since decided. *Frazier* v. *Cupp,* 394 U. S. 731; *United States* v. *Retolaza,* 398 F. 2d 235 (4th Cir., 1968); *United States* v. *Alloway,* 397 F. 2d 105 (6th Cir., 1968); *Maxwell* v. *Stephens,* 348 F. 2d 325 (8th Cir., 1965); *Commonwealth* v. *Rundle,* 432 Pa. 466. See also, *United States* v. *Stone,* 401 F. 2d 32 (7th Cir., 1968); *Jenkins* v. *State,* (Del.), 230 A. 2d 262, 269-270; Note, Third Party Consent, 1967 Wash. U. L. Q. 12, 25-27. Cf. *Bumper* v. *North Carolina,* 391 U. S. 543.

The defendant's argument with respect to his interrogation by police on February 2 and 3, 1964 cannot be sustained. His objections at the trial were overruled by the Trial Court after full consideration, in the absence of the jury, of the circumstances in which the interrogation occurred. The Court found and ruled that on February 2 and 3 the investigation had not become accusatory within the meaning of the rule announced in *Escobedo* v. *Illinois,* 378 U. S. 478, and accordingly that the defendant was not entitled to the warnings, or to the assistance of counsel, which the rule of that case would require. *State* v. *Santos,* 107 N. H. 490. *Miranda* v. *Arizona,* 384 U. S. 436, decided, after this trial, on June 13, 1966, does not apply to this case. *Frazier* v. *Cupp, supra; State* v. *Santos, supra.*

We are satisfied that the findings and rulings of the Trial Court were amply supported by the evidence, which showed that a general investigation of some fifty suspects by innumerable state and city police was continuing up to February 19, 1964, the date of the defendant's arrest for murder following the first reports that ballistic studies showed the fatal bullets to have been fired by the defendant's rifle.

The evidence of the telephone call made by the defendant to Mrs. Mason on February 2, for purposes of voice identification, and Mrs. Mason's testimony concerning it, was properly received since it involved no "testimonial communication" which would violate the defendant's constitutional rights. *Schmerber* v. *California,* 384 U. S. 757; *United States* v. *Wade,* 388 U. S. 218; *Stovall* v. *Denno,* 388 U. S. 293.

The events of February 2 are further pertinent at this time because the police then obtained articles of the defendant's clothing at his home from which particles were obtained which were received in evidence at the trial. See *United States* v. *Alloway,*

397 F. 2d 105 (6th Cir. 1968), *supra.* Other particles were likewise procured pursuant to the search warrant of February 19, 1964, the validity of which was upheld on the prior transfer. The warrant provided for the seizure among other things of debris, including wood and metal shavings and filings as well as hairs and fibres. Vacuumings of the defendant's automobile took place on February 21, and 24, 1964 and later, on January 4 and April 10, 1965.

Reconsideration of our prior holding with respect to the validity of the search warrant issued on February 19, as urged by the defendant, leads us to no new conclusion. The circumstances surrounding the issuance of the warrant were fully explored at the trial in the absence of the jury. The Court's findings and ruling that the evidence presented to the magistrate was based upon reliable information and warranted his finding of probable cause, are sustained.

The record shows that the magistrate was fully informed as to "the facts relied upon by the complaining officer to show probable cause," and also as to the underlying circumstances from which it was concluded upon reliable information that the articles for which the warrant was issued might be found in the places to be searched. *Aguilar* v. *Texas,* 378 U. S. 108, 113, 114; *State* v. *Coolidge,* 106 N. H. 186, *supra,* 197-201; *State* v. *Titus,* 106 N. H. 219. See *Spinelli* v. *United States,* 393 U. S. 410.

Acting lawfully to enforce a valid warrant, the police were free to seize evidence other than that specified by the search warrant. *Warden* v. *Hayden,* 387 U. S. 294; *Frazier* v. *Cupp, supra;* see *Stanley* v. *Georgia,* 89 S. Ct. 1243, 1251 (concurring opinion). Having properly impounded the defendant's automobile as an instrumentality of the crime (*Palmer* v. *United States,* 203 F. 2d 66; (D. C. Cir., 1953); *Bryant* v. *United States,* 252 F. 2d 746 (5th Cir., 1958); *State* v. *McCoy* (Ore.), 437 P. 2d 734), the investigating officers could properly seize whatever evidence was to be found therein, whether on February 24, 1964 or as late as April 10, 1965. *Frazier* v. *Cupp, supra; Cooper* v. *California,* 386 U. S. 58; *State* v. *Hutton,* 108 N. H. 279, 289.

We find no violation of the defendant's constitutional rights in events of February 2 and 3, 1964, or in the issuance of the search warrant of February 19, 1964 and the conduct of the officers pursuant thereto.

Another constitutional argument advanced by the defendant is that he was denied the speedy trial guaranteed to him by *Art.* 14th Pt. I of the Constitution of New Hampshire, and the Sixth Amendment to the Constitution of the United States. *Klopfer* v. *North Carolina*, 386 U. S. 213. While he complains first of postponement of the probable cause hearing following his appearance before a magistrate on February 20, 1964, no constitutional right was thereby violated, since he was indicted by a grand jury six days after his arraignment. The occasion for a probable cause hearing thereupon ceased to exist. *Smith* v. *O'Brien*, 109 N. H. 317. And see, *State* v. *Myal*, 104 N. H. 188.

It is factually true that the defendant was indicted on February 26, 1964, and brought to trial over a year later, on May 17, 1965. However this does not establish a deprivation of constitutional right. Note, Speedy Trial, 20 Stanford Law Rev. 476 (1968). The right is one to "orderly expedition and not mere speed." *United States* v. *Ewell*, 383 U. S. 116, 120. The accused is entitled to be free from capricious and oppressive delays (*Fleming* v. *United States*, 378 F. 2d 502 (1st Cir., 1967); *Riendeau* v. *Milford Municipal Court*, 104 N. H. 33, 34), but the procedural safeguards afforded him necessitate a deliberate pace. *United States* v. *Ewell, supra.*

Following indictment in this case, the defendant was also indicted on March 26, 1964 on similar charges arising out of the death of Sandra Valade on February 1, 1960. On April 3, 1964, counsel were appointed to represent him. On April 7, 1964, he moved for continuances to the September 1964 term, which were granted. On June 30, 1964, the Court heard his motions for discovery filed on April 13, and 28 and June 19, 1964. In July 1964 he moved to suppress certain evidence. These motions were heard on August 31, September 1, October 6, and October 13, 1964. As a result, findings of fact were made by the Trial Court, and questions of law presented were transferred to this court. They were argued on January 8, 1965, and decided on March 11, 1965. *State* v. *Coolidge*, 106 N. H. 186.

One of the attorneys appointed to represent the defendant died on January 2, 1965, and new counsel was appointed in his place in the following month. On February 2, 1965, pending the decision of this court, the defendant filed motions to quash and dismiss all indictments for failure to provide a speedy trial. After hearing, these motions were denied on February 20, 1965,

when the Trial Court found that certain factors which had contributed to the delay "have also improved the opportunity to have a fair trial." At the same time, the indictments in the Mason case were assigned for trial to commence May 17, 1965.

On March 12, 1965, the Trial Court entered an order for discovery pursuant to a motion filed by the defendant on March 4, 1965. This was in part sustained and in part vacated by this court on April 13, 1965, on the State's petition for a writ of prohibition upon which arguments were heard March 29, 1965. *State* v. *Superior Court,* 106 N. H. 228. The trial date of May 17, 1965 was unaffected by the latter proceedings, and selection of a jury commenced on the assigned date.

This is not a chronicle of unreasonable or unjustified delays, but rather of diligent and careful consideration of issues having potentially decisive relation to the course of the trial, and of protection of the rights of both the defendant and the State. The issues were disposed of "according to the prevailing proceedings of law," free from purposeful or unreasonable delays. *Riendeau* v. *Milford Municipal Court, supra.* We hold that the motions to dismiss upon the ground of infringement of the right to speedy trial were properly denied. See Standards Relating to Speedy Trial, (approved Draft, 1968) A.B.A. Project on Minimum Standards for Criminal Justice; *p.* 25, et seq.

A whole series of contentions advanced by the defendant relates to his inability to obtain a disclosure of the State's evidence because of (1) denial of pretrial discovery of notes made by the police in the course of their investigation, (2) the denial of a specification of particulars with respect to the crimes alleged, (3) the receipt in evidence of testimony concerning analyses made by neutron activation, after denial of pretrial discovery as to whether the State intended to offer such evidence, (4) the destruction before trial of original notes of police officers and of original data compiled by the State's expert witnesses and finally (5) the failure to furnish the defendant with a list of State's witnesses in advance of 24 hours before trial. See RSA 604:1.

All of these factors, it is suggested, combined to deprive the defendant of effective assistance by his counsel and of an opportunity to discover evidence in his favor, in violation of his right to a fair trial as guaranteed to him by the Sixth Amendment to the Constitution of the United States.

The first two factors of which the defendant now complains were considered by this court in response to the State's petition for a writ of prohibition filed March 15, 1965. *State* v. *Superior Court,* 106 N. H. 228. Following that decision, the Trial Court on April 15, 1965 met with the parties and discussed arrangements by which the defendant's expert should have access to the bullet slugs in the State's custody, and the question of whether any written statements made by the defendant were to be produced by the State for the defendant's inspection. See *State* v. *Superior Court, supra,* 231. The prosecution disavowed the existence of any recordings of statements made by the defendant and of written statements signed by him. In accordance with his interpretation of the opinion, the Trial Court did not require the State to produce any notes of recollections by police of conversations with the defendant on January 28, February 2 and February 3, 1964 which were later recorded in police reports.

The defendant accordingly complains in substance of what he considers to be the unduly restrictive effect of the previous opinion (*State* v. *Superior Court, supra*), setting aside the Trial Court's prior order for "a bill of particulars" pursuant to paragraph 8 of the motion for discovery, and denying his right of access to the "work product of the State."

At the trial it appeared in the course of cross-examination of police officers called by the State that in several instances original notes made by the witness with respect to his investigation had been destroyed after they were embodied in formal reports which were available at the trial. In somewhat similar fashion it appeared that certain recorded data developed by the expert witnesses who testified for the State with respect to neutron activation analysis had been destroyed for lack of storage space, after their salient features had been embodied in other recorded data which were produced by the witnesses.

The record, however, falls short of demonstrating that the defendant was thus in any way deprived of evidence calculated to favor his defense. Our consideration of the arguments advanced does not lead us to depart from the views expressed in *State* v. *Superior Court, supra,* or to come to the conclusion that the defendant has been deprived of evidence, or opportunities to discover evidence, to which he may rightfully be considered to have been entitled. See *State ex rel Regan* v. *Superior Court,*

102 N. H. 224, 226, 227. So far as the argument relates to the discovery of the State's purpose to utilize evidence derived from neutron activation analysis, it appears to us that the State was not required in advance of trial to reach a firm conclusion concerning its use of such evidence at the trial, and that the defendant was not prejudicially deprived of an opportunity to defend against such evidence, since he was in a position to call to the stand at the trial his own expert witnesses who testified adversely to the conclusions advanced by the State in reliance upon the data which it introduced in evidence.

The defendant has suggested no authority supporting his argument that the destruction of a policeman's original notes, the substance of which was produced in different form, operated to violate his rights, and we are aware of none. We do not consider that the failure of the expert witnesses to make or preserve records of their pretrial investigations or experiments is any more violative of the rights of the accused. To the extent that such conduct can operate to affect the weight of a witness' testimony, the defendant in this case had the benefit of its exposure on cross-examination.

In connection with the conference of April 15, 1965 between the court and counsel, the defendant advances the argument that the Trial Court then laid down a ruling which was ignored at the trial, and which should have been enforced to preclude receipt of the testimony of the witness Beaudoin, who testified as an expert on ballistics for the State.

In the course of that conference the Court suggested that if Beaudoin, as a state police officer familiar with the procedures of ballistic investigation, should act as custodian of bullets while they were examined by the defendant's expert, he should not later be permitted to testify "as to what the expert did." We do not consider this to have been a ruling by the Court, but rather an observation made early in the conference which ceased to be significant by the time the conference closed in apparently amicable understanding of the "ground rules" to be followed, so far as it was practical to determine them at that time. The circumstances under which the defendant's expert examined the bullets were fully disclosed to the jury and the defendant's contentions on this point merit no further consideration.

We find no merit in the defendant's attack on the provisions of RSA 604:1 requiring that "a list of the witnesses to be used

. . . be delivered to [the accused] 24 hours before the trial . . . ." The defendant sought to obtain such a list by motion filed May 13, or four days before trial. It has been pointed out that the purpose of such a statute is to inform the defendant what witnesses are to be called to testify against him. *State* v. *Thorp,* 86 N. H. 501, 505; *Logan* v. *United States,* 144 U. S. 263, 303-308. Where no surprise results, the omission of a witness' name from the list has been held not to preclude calling the witness. *State* v. *Williford,* 64 Wash. 2d 787.

The defendant attaches significance to the list in this case, because it bore the names of the experts in the field of neutron activation analysis and the defendant was thus certain for the first time that such evidence would be presented. Earlier notification, it is suggested, "would have permitted a greater opportunity to . . . improve cross-examination and question credibility of the experts," and even might have permitted arrangements for the defendant to conduct similar tests by his own experts.

The statute does not preclude the furnishing of the names of expert witnesses in advance of 24 hours before trial, but the defendant suggests no reason why the State should have been required to commit itself to the calling of the experts on neutron activation analysis further in advance of the trial; and we note that in this case after trial commenced on May 17, ten days elapsed before the drawing of the jury and the view were concluded, and the taking of testimony could commence. We find no basis for holding in this case that compliance with the statute violated the defendant's rights.

Many of the defendant's exceptions relate to matters which do not concern constitutional rights. Shortly before trial, the defendant sought an order which would require the State to elect one of the two Mason indictments upon which it would proceed, and would dismiss the other. The motion was properly denied when made, and when later renewed during the trial. The indictments charged separate crimes, and both were supported by evidence which ultimately warranted their submission to the jury. No convincing reason is advanced for requiring the State to abandon one indictment in favor of the other, and no abuse of discretion appears in the Trial Court's order of denial, since both offenses arose out of the same transaction. 5 Wharton's Criminal Procedure (Anderson, 1957) s. 1938; *State* v. *Nelson,* 103 N. H. 478, 485. There was no risk present that the verdicts of the jury

might be ambiguous, cf. *State* v. *Lincoln,* 49 N. H. 464, 471.

The offense of kidnaping was one which could be found to have been committed in Hillsborough county. The victim's body was discovered in that county, and in the absence of evidence that the homicide was committed elsewhere, an inference that the crime was also committed there was warranted. *Commonwealth* v. *Knowlton,* 265 Mass. 382. See *State* v. *Forbes,* 75 N. H. 306, 307. The defendant's contention that there was a violation of Part I, Article 17th of the New Hampshire Constitution for failure to establish that the homicide took place in Hillsborough county cannot be accepted.

Early in the trial the defendant raised an issue with respect to the Attorney General's opening statement. This objection was revived from time to time, as the defendant sought to keep suggestions of sexual implications from the jury. In recounting the findings at the autopsy, the Attorney General stated that the victim's breasts had been bruised and the "genitalia was extended . . . in a manner not inconsistent with sexual intercourse." Following the opening statement, and again on the following day, the defendant moved to strike these assertions or in the alternative that the Court order a mandatory examination under the sexual psychopath law (RSA 173:3). The motion was denied subject to exception. It was renewed, and again denied, after evidence was received that "tests were inconclusive for recent or fresh sexual assault" and again at the close of the State's evidence, following testimony that the genitalia showed no evidence of abrasion or contusion.

The motion for an examination under RSA ch. 173 was properly denied. The mandatory provision of the chapter requires such an examination when a person is "arrested and charged with one or more of the following sex offenses: . . . enticing a female child . . . ." RSA 173:3 I. The offenses of murder and kidnaping of a minor are not included. The offense referred to by the mandatory section is that established by RSA 579:8 which is specifically captioned "Enticing Female Child," and imposes a penalty for enticing or carrying away for the purpose of prostitution or illicit sexual intercourse. Clearly, this was not the offense with which the defendant stood charged.

The motion to strike was properly denied in view of the evidence that the pathologist who performed the autopsy found

multiple contusions and bruises of both breasts and was able to insert two fingers in the opening of the vagina, that the victim's body was found without underclothing or blouse, and that her ski pants were cut open in the area of the crotch. The inferences to be drawn from the evidence could reasonably be said to warrant "the allegations and insinuations" which the defendant claims to have operated to deprive him of a fair trial.

In the course of the trial, the State called as an expert witness Dr. Harold C. Harrison, a consultant in micro-analysis and director of a university laboratory for scientific investigation. His testimony related to the matching of particles obtained by vacuumings from the victim's clothing with particles similarly obtained from the clothes or automobile of the defendant. The particles were selected because of visual similarity in color, texture, and hue as seen by microscope. Of some forty sets of particles so selected, in each case comparing particles obtained from the victim with particles obtained from the accused, the witness concluded that the particles matched in each of twenty-seven of the sets were indistinguishable, and similar in all tests performed. Photographs of these sets were exhibited to the jury. In addition to the visual tests, the matching pairs were subjected to comparative refractive index tests. Paper particles were given a Hirshberg stain test. Finally a solubility test was applied. The witness concluded that each matching set was an independent subject from each other matching set, and that by the law of statistical probabilities the victim's clothing, which was the source of one particle in each set, had been in contact with the defendant's clothing or automobile, the sources of the second particle of each set.

We are of the opinion that this evidence was properly received. The fact that the only tests applied to determine that there was no duplication in the 27 matching sets were the tests of color, texture, and hue, did not make the evidence incompetent, but went to its weight. *State* v. *LaFountain,* 108 N. H. 219, 221. In expressing his conclusion based upon statistical probabilities, the witness relied upon previous studies made by him, indicating that the probability of finding similar particles in sweepings from a series of automobiles was one in ten. Applying this as a standard, he determined that the probability of finding 27 similar particles in sweepings from independent sources would be only

one in ten to the 27th power. See *People* v. *Collins,* 66 Cal. Rptr. 497, 500, footnote 8; *State* v. *Sneed,* 76 N. M. 349. Hence he concluded that there was a mathematical probability that the similar particles taken from the belongings of the victim and of the accused respectively, had a common origin which established physical contact between them.

While the evidence for the defense tended to show that the tests employed by the State's expert were neither discriminatory nor conclusive, and the expert himself conceded that all twenty-seven sets of particles may not have been wholly independent of each other, these considerations went to the weight of the testimony rather than its admissibility. A similar question arose concerning the significance of the results of tests of particles made by means of neutron activation analysis. Much time at the trial was devoted to consideration of the admissibility of evidence derived from such tests. To determine this question, the Court in the absence of the jury received expert testimony concerning the nature of the analysis, the methods by which the witnesses conducted it, and the extent to which the results of such processes have gained scientific recognition.

In his opening statement to the jury, the State's Attorney General had outlined at some length the nature of the scientific evidence which the State proposed to offer, including evidence that it had been determined by means of neutron activation analysis that hair found upon the victim's body and clothing corresponded with hair obtained from the defendant's pubic region. The State called as an expert witness C. Michael Hoffman, an employee of the United States Treasury Department, experienced in the examination of physical evidence by neutron activation analysis. The witness gave a general description of the method by which such an analysis is made and tendered his report of the analysis of hairs, and of particles submitted to him by the State in this case. The Trial Court thereupon conducted an extended hearing, out of the presence of the jury, for the purpose of determining the extent to which the results of such analyses have gained scientific recognition and acceptance in order to rule upon admissibility of the proffered evidence. *Frye* v. *United States,* 293 Fed. 1013, 1014 (D. C. Cir. 1923).

The hearing consisted of the testimony of experts called by both parties. It disclosed that the procedures involved were

essentially those described in Watkins, Identification of Substances by Neutron Activation Analysis, 15 Am. Jur., Proof of Facts, Annot., 115, et seq. (1964). The process, as there stated, "is essentially one whereby the material to be analyzed is first made radioactive . . . so that it will give off or emit radiation in the form of gamma rays. This radioactive sample is then exposed to a scintillation crystal; and every time a gamma ray from the [sample] interacts with the crystal, it emits a flash of light, which is converted into an electrical pulse whose voltage is proportional to the energy of the gamma rays. An electronic device . . . then sorts the electrical impulses into different energy groups and adds up the pulses in each group. The result is a graph shown on an oscilloscope screen . . . . The graph contains information related to the kind and amount of elements in the radioactive sample and can be transcribed immediately or stored on magnetic tape or punched paper tapes for future reference." *Id.,* 116-118.

The hearing by the Court without the jury resulted in a ruling excluding the evidence with respect to tests made upon samples of hair, but admitting evidence with respect to comparative tests of the particles vacuumed from clothing of the victim, on the one hand, and from clothing of the defendant and from his car, on the other hand. The Court found that the hair-identification tests had been conducted by the State's experts in reliance upon prior work in which an expert called by the defendant was the "principal worker in the field," that his methods differed materially from those utilized by the experts for the State, and that the evidence on hair-identification offered by the State would not be acceptable to scientists in the field. See *State* v. *Holt,* 17 Ohio St. 2d 365.

The Court ruled however that "the evidence with reference to particles stands upon somewhat of a different basis" since unlike the evidence with respect to hair analysis, this evidence was not presented as being "as infallible as that of fingerprints." Cf. *People* v. *King,* 72 Cal. Reptr. 478. The Court found: "Here, it is understood there is no attempt at identification by comparison of the particles involved. That all . . . this evidence purports to show is a similarity of the particles based upon a qualitative and somewhat quantitative examination of the particles by neutron activation." Subject to the defendant's exception the

evidence with respect to analysis of the particles was presented before the jury.

The testimony upon this score disclosed that some forty samples of particles were visually selected for analysis, based upon similarity of appearance under a microscope. Of the particles so selected and subjected to nuclear testing, four sets, (each consisting of particles obtained from the victim on the one hand and from the accused on the other), were found to have various chemical elements in common and in such comparable abundance as to warrant testimony by the expert that the particles in each set had a common origin or source, although each set differed in composition from the other.

In support of his exception to receipt of this evidence, the defendant argues first, that neutron activation analysis was not shown to have gained general acceptance in the scientific profession, at least for purposes of matching "unknown particles," secondly, that the "technique actually used" did not follow the technique generally accepted by the profession, and finally, that the evidence of similarity was insufficient to support the witness' conclusion of common origin, or to permit a like inference by the jury.

We are not disposed to hold the evidence inadmissible for the reasons advanced. A close examination of the arguments in support of the defendant's contentions indicates that all are based upon the central theme that in the absence of scientific studies of "known" substances serving as a control to indicate the prerequisites to a conclusion of common origin, the evidence of similarity disclosed by the tests of "unknown" substances received in evidence is not entitled to the probative effect assigned to it by the State's witnesses. In the language of the defendant's brief and argument, his contention is that it was error to receive the results of the analysis "without requiring that the State establish a foundation for conclusions as to the significance of trace elements of particles," by showing the frequency with which they occur in the same relative combinations in the "general population of particles."

The parties are in agreement that in order for the results of scientific tests to be admissible in evidence, the scientific principle involved "must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye* v.

*United States,* 293 Fed. 1013, 1014, *supra.* See *People* v. *Williams,* 164 Cal. App. 2d Supp. 858; *State* v. *LaForest,* 106 N. H. 159, 160. The subject is discussed in Conrad, Modern Trial Evidence (1956) *s.* 711, (1966 supp); Richardson, Modern Scientific Evidence (1961) *ss.* 6.3, 6.16; Wigmore, The Science of Judicial Proof (3d *ed.*) (1937) *s.* 220, *p.* 450; and 3 Wigmore, Evidence (3d *ed.*) *s.* 795.

The Trial Court properly applied this principle in excluding the evidence relating to hair identification, in view of the testimony of the defendant's expert, Dr. Robert E. Jervis, a recognized pioneer in this new field. The testimony concerning the analysis of particles however did not purport to attribute to the conclusions reached the same infallibility which the excluded evidence had been claimed to have. The Court could properly find that the tests of particles produced an accurate analysis of the chemical elements which they contained, by means of procedures sufficiently accepted by scientists familiar with this limited field. See *State* v. *Roberts,* 102 N. H. 414; *State* v. *Reenstierna,* 101 N. H. 286.

The fact that the defendant's expert testified that he would have subjected the particles to longer periods of radiation, and required a more absolute qualitative testing, went to the weight of the evidence received rather than its admissibility. *State* v. *LaFountain,* 108 N. H. 219, 221, *supra.*

The probative significance of the results of the analysis was a matter for expert opinion. The State's witness Hoffman had conducted extensive tests upon "unknown" paint samples, and participated ·in other testing programs. He was of the opinion, as to four different sets of matching substances each of which was found to have common elements in comparable relative abundance, that each set came from a common source, or origin, although found in different places. The defendant's expert entertained a contrary view of the significance of the findings. The issue so presented was one which was properly submitted to the jury for decision. *State* v. *Thorp,* 86 N.H. 501, 507. Essentially, as in the case of Dr. Harrison's matching tests, the issue involved the "mathematical theory of probabilities." See 2 Wigmore, Evidence, (3d *ed.*) *s.* 414 *p.* 389; *People* v. *Collins,* 66 Cal. Reptr. 497, 500, *supra; State* v. *Sneed,* 76 N. M. 349, *supra.* We cannot hold that the testimony of either Hoffman or Harrison was irrelevant or incompetent as a matter of law.

These indictments were tried against the backdrop of the pending Valade indictments. On *voir dire*, the defendant agreed that the Valade case should be mentioned to prospective jurors. In cross-examination of the State's ballistic experts, the defense adduced testimony that in their opinion the Valade bullets, obtained by autopsy in February 1960, resembled test bullets fired from the Mossberg rifle in evidence or that they were in fact fired by that weapon. This examination was permitted over the objection that it might result in mistrial, after a ruling by the Trial Court that it was "clearly understood that the defense assumes the risk of this line of questioning."

After the State had rested, the defendant took the stand, and testified that he first acquired the rifle in evidence by shipment from the Mossberg Company in December 1961. The prosecution then informed the Court that as of the preceding afternoon they had received information indicating that this was so, and that as a result the Valade bullets had been examined at the State's request by a Massachusetts expert named Collins, who had given the opinion that the Valade bullets were not fired by the weapon in evidence. On Saturday, June 19, 1965, the witness Collins was called by the defense, and so testified. At the request of the State, the Mason bullets were delivered to Collins on the afternoon of June 18, 1965 for examination over the week-end. On Monday June 21, State's counsel informed the Court that Collins was unable in the time available to reach a conclusion as to whether or not the Mason bullets were fired by the weapon in evidence, but had suggested that it would be "serious error" to dismiss the indictments in the Mason cases. Collins declined to pursue his investigation of the Mason bullets further, in view of the advanced status of the trial.

In the course of discussion with Court and counsel, the prosecution disclosed that certain aspects of Collins' report on the Mason bullets might be considered favorable to the defendant, and other aspects favorable to the State but that on the whole it was merely "cumulative." No further disclosure was required by the Court, and none was formally sought by the defendant.

The trial resumed and examination of the defendant continued. The State examined him concerning his previous ownership of a handgun of a type which might have fired the Valade bullets, the defendant having previously made the statement that he had owned but lost such a gun before February 1960. After the

defendant's evidence was closed, the Court ruled that the State would not be permitted to present evidence contradicting the defendant's testimony concerning handguns, and instructed the jury that it was "ruled out . . . on the ground that it's a collateral issue." The instructions continued: "Since you're only concerned with the rifle in evidence, and it's a collateral issue . . . that's the end of it." The defendant later moved to strike the testimony concerning other guns, and his motion was denied upon the ground that the jury had been instructed to "disregard the evidence as far as a particular issue in this case."

Following the charge to the jury the defendant for the first time suggested that the Court should have instructed the jury that it "must first find. that this Mossberg weapon was used to kill her" and that "this knife is not the murder weapon." After the verdicts the defendant moved to set the verdicts aside, alleging among other grounds that his constitutional rights had been violated by the State's failure "to disclose all evidence favorable to the defendant." In support of this motion an affidavit of counsel was filed, relating conversations with the witness Collins on July 14 and August 2, 1965, but stating that Collins had made "no substantial examination of the Mason bullets after attending the trial." The State moved to strike the affidavit, filing with its motion copy of the letter from Collins to defense counsel dated August 3, 1965 and referred to in the affidavit of counsel, in which Collins declined to furnish the defense with an affidavit, and reiterated his inability to "formulate any definite conclusion" with respect to the Mason bullet, or to add to his testimony at the trial. On the basis of this letter, the affidavit of counsel was ordered stricken from the record. The defendant thereafter moved for leave to take the witness Collins' deposition, which was likewise denied.

The defendant contends that as a result of what occurred at the trial the jury was permitted to speculate that the defendant shot Pamela Mason with some weapon other than the Mossberg rifle in evidence, and that his constitutional rights were thereby violated. The argument appears to disregard the instruction to the jury given at the close of the evidence, that the jury was "only concerned with the rifle in evidence." If the defendant considered this instruction insufficient to overcome the risk of misuse of the evidence regarding other guns, received primarily upon the issue of the defendant's credibility, it was open to him

to request additional instructions, which he failed to do. The instruction given was not so plainly inadequate as to result in prejudice to the defendant's rights. See *Frazier* v. *Cupp, supra.* Moreover in submitting the cases to the jury the Court read to them the indictment charging murder with "a Mossberg 22 calibre rifle Palomino model 400 SLLR."

As the State has pointed out, the Valade bullets came to play a part in the trial as a result of the defendant's examination of the plaintiff's experts with respect to them. Confident of his ability to establish that he did not own the Mossberg rifle at the time of the Valade crime, he pursued this course under the ruling that "the defense assumes the risk of this line of questioning." One of these risks was that the State would seek to overcome a possible inference that the defendant was innocent of the crime charged by the Valade indictment. Its effort to present testimony concerning his possession of handguns was properly cut off by the ruling of the Trial Court. *State* v. *Prevost,* 105 N. H. 90. If any prejudice could have resulted to the defendant from what transpired, it arose from calculated risk which he shouldered early in the trial. Having enjoyed the advantage of his stratagem, he cannot now be relieved of incidental burdens.

In the orders striking the affidavit of defendant's counsel and denying the motion for leave to take the deposition of the witness Collins we perceive no error. Defendant's counsel had full access to the witness during the trial and could have offered any further testimony by him which they considered essential. The record suggests no material evidence withheld by the prosecution. On the contrary the witness Collins' opinion concerning the Valade bullets was voluntarily revealed to the defense by the prosecution. There is nothing in the record to suggest that the witness would have given any opinion concerning the Mason bullets which differed from what he had said at the trial. The affidavit of counsel filed in August, expressly stated that he had "performed no substantial examination of the Mason bullets" since the trial.

We have fully examined and considered at length the contentions advanced by the defendant's voluminous brief and the oral arguments of his diligent counsel. We find no cause to vacate the verdicts of the jury.

*Exceptions overruled.*

GRIFFITH, J., did not sit; the others concurred.