STATE of Missouri, Respondent,

v.

Glenn Alan SMITH, Appellant.

No. WD 32857.

Missouri Court of Appeals,
Western District.

June 8, 1982.

Motion for Rehearing and/or Transfer to
Supreme Court Overruled and Denied
Aug. 3, 1982.

Application to Transfer Denied
Sept. 13, 1982.

Charles Ross Stroupe, Columbia, for appellant.

John Ashcroft, Atty. Gen., William K. Haas, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P. J., and PRITCHARD and DIXON, JJ.

SHANGLER, Presiding Judge.

The defendant Smith was convicted by a jury on counts of rape [§ 566.030, RSMo 1978], sodomy [§ 566.060] and first degree burglary [§ 569.160]. The defendant was sentenced to consecutive terms of fifty years, fifty years and fifteen years on the respective counts. The appeal contends error from the admission of evidence and the systematic exclusion of blacks from the venire.

The evidence was that at about 9:00 p. m. a black man identified as the defendant came into the residence of the victim, TS, through the doorway from the basement,

grabbed her and immediately began to forcibly disrobe her. The face of the assailant was covered with mask with eye-slits fashioned from a pantyhose. A frantic struggle ensued from room to room in the course of which the victim managed to pull up the mask and observe the face of the assailant before he could restore its cover. In the course of the resistance, the assailant attempted to reach a knife in the kitchen and managed access to a curtain rod which he pressed against her throat to compel her to the act of fellatio. The struggle continued and the assailant finally succeeded to penetrate the priapus into the sexual organ of the victim. He did not ejaculate during penetration, but spewed her face with semen after withdrawal. The assailant then dragged TS into the bathroom to compel her to bathe, but the victim resisted. In that continued struggle, she again unmasked the assailant and saw the face in the full light of the bathroom. He made no attempt to re-cover the face, but the entreaties of the victim and her warning of an expected visit from a friend prompted the assailant to leave. The encounter had lasted a full hour. The victim called the police. On the basis of the description TS gave, the police apprehended the assailant still in his car only some ten minutes later. TS was driven to the scene of the detention where she positively identified the occupant of the car, the defendant Smith, as her assailant. The defendant was placed in arrest and a search of the vehicle yielded the pantyhose used as a mask.

The victim was taken to the hospital and examination revealed a bruised and scratched face and a lacerated toe. A vaginal smear resulted in no trace of motile sperm.

A comb with two hairs was retrieved by police from under a cushion of a sofa in the residence of the victim. The prosecution gave evidence that the hairs found at the site of the assault and the hair samples taken from the head of the defendant were of common origin. The prosecution gave evidence also that a foreign fiber taken from the hair of the defendant shortly after arrest and the fibers taken from the panty-

hose found in the car were chemically indistinguishable. That evidence was given in the form of expert opinion based on the test results of neutron activation analysis. The defendant contends that the test procedure itself was not reliable and that the witness lacked qualification as an expert to render opinion.

The expert for the prosecution was one Baxter, a forensic chemist. He described in detail the procedures and principles involved in a neutron activation analysis. The test subjects the evidence samples [in this case, the hairs and fibers] to a bombardment of neutrons in a nuclear reactor. The neutrons cause the trace elements in the samples to become radioactive. Each of the elements emits a distinctive radiation [gamma ray]. The irradiated samples are then placed in a germanium lithium detector which converts the gamma ray emission of each trace element into an electrical impulse projected onto a graph and identified and quantitatively measured by the measure. In the case of hair or fiber, the neutron activation breaks down the components of each material into its basic elements to enable comparison. If the hairs or the fibers display the same elements and the same concentration of these elements, the comparison may result in a match of the materials and justify the conclusion that they are of common origin. This method of analysis, the witness testified, is also suitable for gunshot residue, glass and other evidence materials.

The expert witness then testified that this procedure was applied to test and compare the hair samples taken from the head of the defendant and the hair taken from the comb found at the site of the assault. He described the actual test process step by step. The analysis disclosed that nine trace elements in each of the hair samples matched both in kind and in concentration with the hair taken from the comb. The witness testified that a neutron activation analysis which yields comparable concentrations of seven component elements between the hair samples allows an opinion to a scientific certainty that the hairs are from a

common origin.[1] The expert gave opinion within a reasonable degree of scientific certainty that the hair from the comb and the hair taken from the head had a common origin—the defendant.[2]

The expert witness testified also that this procedure was applied to test and compare the fiber found in the head hair of defendant soon after arrest with fiber from the pantyhose found in his car. The analysis disclosed that ten elements in each sample matched in kind and in concentration. He gave opinion that the two samples were *chemically indistinguishable* but could not draw the ultimate conclusion that they had a common origin. The reason for that lack of scientific certainty was that his test experience was not sufficient to determine whether the fiber taken from the pantyhose for comparison was typical or atypical in elemental components. It was the first pantyhose analysis the witness undertook by the neutron activation method. In preparation for the test, the witness made four random purchases of pantyhose, subjected them to neutron activation analysis, and determined that the component elements "were vastly different from either the unknown sample or the pantyhose that were submitted." The random samples were not a sufficiently broad test group to establish the statistical probability for a scientific opinion of common origin of the compared fibers—and the witness gave none.

■ The defendant contends that witness Baxter did not qualify as an expert and so the opinions on the neutron activation analysis results were not competent evidence. A witness who "by reason of education or specialized experience ... possesses superior knowledge respecting a subject about which persons having no particular training are incapable of forming an accurate opinion or drawing correct conclusions" qualifies as an expert. *State v. Stevens,* 467 S.W.2d 10, 23[12] (Mo.1971). The determination that a witness qualifies as an expert rests with the discretion of the trial court, an exercise not disturbed on review in the absence of abuse. *State v. Sager,* 600 S.W.2d 541, 572[10] (Mo.App.1980).

■ The witness Baxter was employed by the University of Missouri as a forensic chemist and, at the time his opinion was accepted as evidence, he practiced that function for seven years. He held a Bachelor of Science degree in chemistry and a Master in Business Administration postgraduate degree. His actual experience included some 70 separate instances of hair neutron activation analysis, participation in the compilation of a statistical library over the seven years of that special practice, and gave expert testimony on the subject in more than 100 court cases.[3] The defendant

---

1. There was neither inquiry nor dispute as to the empirical basis for such an opinion. The source for that extrapolation of statistical probability presumably derives—as numerous judicial opinions report—from the Canadian data bank of experiments and study done on the subject and reported in Watkins and Watkins, Identification of Substances by Neutron Activation Analysis, 15 Am.Jur. *Proof of Facts* 115 (1964). [*See State v. Stevens,* 467 S.W.2d 10, 22 (Mo.1971); *United States v. Stifel,* 433 F.2d 431, 436 (6th Cir. 1970); *United States v. Massey,* 594 F.2d 676, 679 (8th Cir. 1979)]. That study concludes [Watkins and Watkins, supra, l.c. 131] that when the test yields *seven* comparable concentrations of component elements, the probability is 4,250,000 to 1 that they are from the same source. When—as under this evidence—the compared hairs yield *nine* comparable concentrations of component elements, the probability is increased to 33,300,000 to 1 that they are from the same source.

2. The witness rested opinion directly on his own experience during seven years of hair comparison by the neutron activation analysis. During that period, he conducted some 70 separate analyses by that method of some seven or eight hundred hairs and compiled a library of data. The experience from that compiled information was that "we have never seen two hairs from two different sources that even closely approximated each other where there would even be a possibility of mismatching."

3. The witness Baxter named Vogt, Eichor and Morris as his mentors and colleagues throughout his forensic career. These personages, in turn, one a manager of the University of Missouri Nuclear Research Facility at Columbia, the others, scientists at the facility, were all determined in our various appellate opinions as judicially qualified experts in neutron activation analysis. *See State v. Johnson,* 539 S.W.2d 493, 501 (Mo.App.1976); *State v. Ste-*

objects that the graduate business instruction is irrelevant to the scientific procedures the neutron activation analysis involves and that a practitioner tendered as an expert in such a technical process must be not qualified, merely, but "highly qualified"—a condition not met by witness Baxter. The business administration study, if nothing else—as the witness observed, furnished the statistics ground which informs the technical scientific analysis of the neutron activation method. The comparative preeminence of qualification may bear on the weight the jury will accord the opinion, but not on the admissibility of the opinion of an expert qualified to give opinion. The witness Baxter was properly allowed to testify as an expert on neutron activation analysis.

The defendant contends next that the neutron activation analysis procedure was not generally accepted by the scientific community as a reliable method to test and compare hair and fiber samples so that any opinion based on that technique was speculative and not competent as evidence.

 Our law prescribes that the results of scientific tests and expert opinions rendered on such results are admissible only if the principle involved has general acceptance in that particular scientific community. *State v. Johnson*, 539 S.W.2d 493, 501[1] (Mo.App.1976).[4] The defendant concedes that the neutron activation analysis method is deemed reliable in the scientific community to test gunshot residue [*State v. Ross*, 523 S.W.2d 841, 845[5] (Mo.App.1975)] but argues that such an approval does not constitute a scientific sanction for the use of that method of test analysis to every evidentiary material—human hair or fiber, among them. The efficacy of the nuclear activation method to detect traces of elements in miniscule samples to solve prob-

lems of identification of evidentiary materials is firmly established. *United States v. Stifel*, 433 F.2d 431 (6th Cir. 1970); *State v. Spencer*, 298 Minn. 456, 216 N.W.2d 131 (1974); *State v. Johnson*, 539 S.W.2d 493 (Mo.App.1976); *State v. Ross*, 523 S.W.2d 841 (Mo.App.1975); *State v. Stevens*, 467 S.W.2d 10 (Mo.1971); *State v. Coolidge*, 109 N.H. 403, 260 A.2d 547 (1969), rev'd on other grounds, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The method is used both to detect the mere presence of certain elements [such as barium and antimony found in gunshot residue on the hand of a person who fired a gun [*State v. Ross*, supra, l.c. 845]] and to compare the trace elements in two samples—such as strands of hair, to determine if they have a common origin [*State v. Stevens*, supra, l.c. 22]. The first application of the test method merely establishes the *presence* of the minute elements of the material on the subject [gunshot residue], the second, a scientific *probability* that the compared materials [hairs] contain the same main trace elements in the same concentrations—and so have a common origin. The expert conclusion that the compared materials are of common origin, therefore, depends not only upon a technology scientifically accepted, but also upon statistical considerations. [*See*, supra, footnote 1; *also* Comment, *Neutron Activation Analysis*, 37 Mo.L.Rev. 295, 307 et seq. (1972)] That is to say, the probative force of an expert opinion that hairs compared by the neutron analysis method are of a common origin presupposes a datum of statistical probability from which the opinion can issue with a reasonable scientific certainty. The appellate opinions accept not only the efficacy of the neutron activation analysis method as a scientifically established technique to compare

---

vens, 467 S.W.2d 10, 23[13] (Mo.1971); *State v. Ross*, 523 S.W.2d 841, 844[3, 4] (Mo.App.1975).

**4.** Recent comment and decisions suggest that this rule unnecessarily binds a court to an "*independently controlling standard* which exists over and above relevance . . . and the capability of the expert testimony to assist the trier of fact"—and so invites judges to surrender to scientists the responsibility for determining the

reliability of that evidence. *United States v. Williams*, 583 F.2d 1194, 1198 (2d Cir. 1978); *State v. Catanese*, 368 So.2d 975, 978 (La.1979); *State v. Williams*, 388 A.2d 500, 504 (Me.1978); C. McCormick, Handbook of the Law of Evidence § 204, p. 491 (2d ed. 1972); Imbert, *Evidence*, 1980 Annual Survey of American Law 497.

hairs, but also [expressly or by a tacit judicial notice] that the accumulated data on representative hair samples by that method of analysis [the Watkins study, *see*, *supra*, n. 1] provides a sound statistical basis from which the opinion of common origin may be drawn—once the points of identity of the elemental components of the samples are established. *State v. Coolidge*, 109 N.H. 403, 260 A.2d 547, 559 (1969), rev'd on other grounds, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *State v. Stevens*, 467 S.W.2d 10, 22 (Mo.1971); Moenssens and Inbau, *Scientific Evidence in Criminal Cases*, 452 (2d ed. 1978); Comment, *Neutron Activation Analysis*, 37 Mo.L.Rev. 295, 307 et seq. (1972).

■ The defendant argues that our courts have yet to approve the results of the neutron activation analysis of human hair samples as a basis for expert opinion evidence. *State v. Stevens*, 467 S.W.2d 10 (Mo.1971) affirmed a criminal conviction on neutron activation analysis evidence that the hairs found on clothes of the victim and hairs taken from the head of the defendant were from a common source. The opinion noted that although [at that date] the neutron analysis method was a relatively recent scientific process, testimony on the results of such tests had been already received in more than seventy-five reported cases. In discussion, the court made specific reference to the exhaustive and influential Watkins article on the subject to approve the neutron activation analysis process to the comparison of hair samples as a basis for an expert opinion that the hairs were of common origin. The defendant on appeal did not challenge the reliability of that test method, but that it was error to permit the witness, tendered as an expert, to give opinion based upon the nuclear analysis test. The appellant contends here that the validity of the nuclear activation analysis process as a method to compare the chemical trace elements of hairs was not an issue in *Stevens* so that any approval by the court of

opinion evidence based on such a test was only gratuitous, without authoritative effect, and only apparent. It is clear from the response of the *Stevens* court to the point of error [a vague and inartful formulation][5] that the validity of the opinion of the expert was inseparable from the validity of the test method itself—even though the reliability of the neutron analysis procedure was not an explicit issue. That was the purpose of the detail of narrative [l.c. 22–23] as to the theory of the analysis technique as a method to identify evidential materials, the actual method of test, the recurrent reference to the authoritative and pervasive Watkins treatise on the subject, and the acknowledgment of the "enthusiastic use" of the neutron activation analysis test for evidential purposes in judicial proceedings. Those approbations and encomiums issued in an appeal from a criminal conviction based on just such test evidence, as in this case, to determine that the hairs compared were from a common origin. That the approval of the neutron activation analysis of hair—as a generally-accepted principle in the scientific community—was an element of the *Stevens ratio decidendi* was acknowledged by that same court in *State v. Stout*, 478 S.W.2d 368, 369 (Mo. 1972), by the court of appeals in *State v. Ross*, 523 S.W.2d 841, 845 (Mo.App.1975), and by other comment on that opinion, Annotation: *Admissibility of Evidence of Neutron Activation Analysis*, 50 A.L.R.3d 96 at 127 (1973). The opinion of expert witness Baxter that the hairs found on the comb at the crime site and those taken from the head of the defendant had a common origin was properly received in evidence.

■ The defendant makes the same objection to the testimony by the expert as to the results of the neutron analysis of the pantyhose fibers. The objection is without ground simply because the expert tendered no *opinion* that the fiber taken from the head of the defendant upon arrest and the

---

5. The rescript of that contention of error [*Stevens*, l.c. 22] reads: "[Appellant] contends that prejudicial error resulted when the court permitted Dr. James R. Vogt to testify 'relative to

his findings based upon computer tabulated data which he obtained after placing certain items of evidence in a nuclear reactor ....' "

fiber from the pantyhose in the car were of common origin. The question posed attempted to elicit "an opinion as to the relationship of those fibers." The defendant objected on the ground that there was an "inadequate foundation" for such an opinion. The witness withheld any ultimate opinion that the results of the analysis demonstrated that the compared fibers were from a *common origin*. He conceded that there lacked a sufficiently broad statistical experience to allow such an opinion with sufficient probability. He testified only that the trace elements of the compared fibers were *chemically indistinguishable* —an opinion which interprets the activation analysis of the component chemical elements of the materials recorded on the graph—and an opinion, therefore, which rests on an adequate foundation. The witness made no assertion that the fibers were from a *common origin*—an opinion which involves an extrapolation of probability from statistical facts, a foundation the evidence lacked. The point on appeal does not pursue the trial objection but only generally suggests that the neutron activation analysis of fibers has not been approved in our jurisdiction as a generally-accepted scientific principle. We note only that *Stevens* approved evidence of the results of neutron activation analysis of threads. [*See also* the Watkins treatise § 16]. The testimony of the expert was probative of the opinion-fact it asserts, that the compared fibers were chemically indistinguishable. The credibility of that testimony was for the trier of fact.

■ The defendant next contends that the defendant was denied a fair trial because blacks were systematically excluded from the jury panel. The defendant made no objection to the venire at the trial, nor does our record show the racial composition of the panel, nor was there motion to quash the venire, nor was there evidence tendered to prove the contention the defendant now asserts. The defendant failed both to make a timely objection and the burden to prove *prima facie* systematic exclusion. The point is without merit. *State v. Anderson*, 598 S.W.2d 593, 594 (Mo.App.1980).

The defendant contends, finally, that the action of the trial court in response to objection was not sufficient to cure the prejudice certain erroneous evidence engendered. The prosecution witness, physician Rebecca Lamb, examined the victim after the assault. The vaginal smear administered to the victim did not reveal any motile sperm. In the course of that narrative, the witness recalled "one other thing, she [the victim] had white stuff on her face that is very consistent with ...." The defendant interrupted that testimony with the objection [outside the hearing of the jury] that the witness was about to speculate that the white substance on the face was sperm. The defendant then elicited from the witness that she did not test the substance and could not be "absolutely positive what it was." The prosecutor then elicited that the substance was "consistent with semen." The defense counsel then objected and asked the court "to have that stricken from the record and the jury." The court directed: "Jury will disregard the witness' last answer." The defendant now contends the action of the court was not sufficient to cure the prejudice from that testimony. He claims plain error.

■ On principle, a litigant who objects to a trial event, invokes a specific relief, and is granted the full request, cannot complaint that the court did not do more. *State v. Woolford*, 545 S.W.2d 367, 372[10, 11] (Mo.App.1976). Implicit in the contention for plain error is that the court was bound by evidence prejudicial to a fair trial to declare a mistrial *sua sponte*. That drastic redress is justified only when the trial incident results in prejudice so grievous that it can be dispelled in no other way. *State v. Parker*, 476 S.W.2d 513, 515[4, 5] (Mo.1972). The crime of rape requires proof of intercourse—penetration, not that the sexual act was consummated. § 566.-030; *State v. Mazzeri*, 578 S.W.2d 355, 356[3, 4] (Mo.App.1979). The testimony of the physician witness, therefore, that the white substance detected on the face of the victim was "consistent with semen," if erro-

neous evidence, was more a corroboration of the testimony of the prosecutrix of the rape rather than proof of any of the essential elements of the crime: the nonconsensual and compelled sexual intercourse [penetration] with another not the spouse. The evidence was not prejudicial. There was no plain error.

The judgment of conviction is affirmed.

All concur.